2026 IL App (2d) 260089-U
No. 2-26-0089
Order filed July 27, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

*In re* I.D., A.D., D.D., and M.D., Minors.

(The People of the State of Illinois, Petitioner-Appellee,
v. Michael D., Respondent-Appellant.)

Appeal from the Circuit Court of McHenry County.
Honorable Carl E. Metz II, Judge, Presiding.
Nos. 24-JA-69, 24-JA-70, 24-JA-71, 24-JA-72

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Respondent's appeal does not present any issue of arguable merit as to whether respondent was an unfit parent and whether termination of his parental rights was in the minor children's best interests. Therefore, we grant appellate counsel's motion to withdraw and affirm the order terminating respondent's parental rights.

¶ 2   Respondent, Michael Davis, appeals from the trial court's order terminating his parental rights to I.D., A.D., D.D., and M.D. (the minor children). Michael's appointed appellate counsel has moved to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967). After a careful examination of the record, we agree with appellate counsel that this appeal does not present any issue of arguable merit. Accordingly, for the reasons set forth herein, we grant counsel's motion to withdraw and affirm the order terminating respondent's parental rights.

¶ 3                                    I. BACKGROUND

¶ 4     The State filed a petition for adjudication of wardship on June 11, 2024. The petition followed a report of a car accident, which report was summarized in the integrated assessment as follows. On June 8, 2024, respondent, his minor children, and their mother, Ashley Henriquez, were involved in a car accident possibly due to road rage on the part of Henriquez. Police responded to the car accident and found M.D. having an asthma attack. The family, including respondent and the other minor children, were transported to a hospital. The family was reportedly living in their vehicle. Respondent and Henriquez were uncooperative and left the hospital without being seen. Henriquez was making statements that she was being followed and that she feared the children would be kidnapped. The minor children were reported to appear underfed and wearing soiled or no clothing; they were covered in feces, urine, and bruises. The minor children indicated that they were not always fed and did not have access to a toilet or bath while living in the vehicle.

¶ 5     The trial court entered an adjudicatory order on August 16, 2024, finding that the minor children were neglected in that they were in an environment injurious to their welfare as defined by section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2022)). The finding was based on stipulations by respondent and Henriquez to various allegations in the State's petition for adjudication of wardship, including that one of the minor children was neglected based on an injurious environment; that two of the minor children were observed at school wearing soiled, dirty clothes that smelled of urine and had bruises and injuries on their bodies; that law enforcement observed on June 8, 2024, that the minor children had many bruises and marks on their bodies, as well as feces and urine on their bodies, clothing, and car seats; and that respondent had previously been indicated for inadequate clothing and had pending cases for (1) cuts, bruises,

welts and other injuries that posed a substantial risk of physical harm/injurious environment, and (2) inadequate shelter and substantial risk of physical injury/injurious environment.

¶ 6　An integrated assessment, completed and approved on September 3, 2024, provided as follows. Respondent was a 31-year-old male who had been diagnosed with a chromosome deletion (6Q21) and developmental delay. He provided "inconsistent and unclear information throughout his interview," and was "unable to answer simple questions[.]" He appeared to rely on Henriquez to manage the day-to-day needs not only of the children but also of himself. "His functional ability and understanding appear[ed] to be significantly impaired" and it was unclear whether any service recommendations would improve his ability to safely parent the minor children.

¶ 7　Respondent and Henriquez had been in a relationship for 12 years and were married in 2023, and they had the four minor children together. As of the date of the integrated assessment, the minor children were ages 10, 9, 8, and 3. Respondent and Henriquez were currently homeless, with respondent residing in a shelter. The family frequently moved from state to state. Respondent was unemployed at the time of DCFS's involvement in the case, but he claimed he was currently employed at a roofing company and had worked several days, making $16.50 an hour.

¶ 8　The assessment stated that respondent had not been able to provide a safe and stable environment for the minor children, including providing basic housing, clothing, education, and medical care. All minor children had a chromosome deletion that put them at risk of developmental delays, and M.D. was diagnosed with autism and asthma, but respondent had not ensured them routine medical care. None of the minor children received routine education.

¶ 9　On September 20, 2024, the trial court entered a dispositional order making the minor children wards of the court. The court found respondent was unfit and unable to care for the minor children, and he was ordered to comply with the family service plan, including that he was to

participate in random screens, individual psychotherapy, and parent coaching, and demonstrate an ability to provide basic needs to the minor children. Visitation was to be supervised. The permanency goal was set to return home within 12 months. The minor children were placed in the care of relatives.

¶ 10    A DCFS family services plan approved November 25, 2024, provided respondent with recommendations for the following needs: cooperation, mental health, substance abuse, domestic violence, and parenting instructions. For cooperation, the report recommended that respondent comply with court orders, report changes in address, employment, phone number, and relationships status to his caseworker, and sign necessary releases and consents. For mental health, respondent was to cooperate with recommendations following a mental health evaluation and demonstrate stability for a period of at least six months. For substance abuse, his recommended actions included refraining from using illegal drugs and cooperating with random drug screens. For domestic violence, he needed to complete a domestic violence assessment and acknowledge his responsibility for past trauma. Last, for parenting instructions, the report seemingly mistakenly repeated the recommended actions for the cooperation need, but the caseworker later testified as to the need for parenting classes.[1]

¶ 11    The service plan, along with a CASA report from April 25, 2025, were approved in a permanency order on May 1, 2025. The CASA report provided that the minor children were stable together in the foster home of their maternal grandmother. Th CASA report further stated that

[1]Two other DCFS family service plans appear in the record as exhibits admitted at the fitness hearing. Their approval dates are July 24, 2024, and June 17, 2024. The recommended services are substantially the same as the November 25, 2024, report, and respondent's progress in the recommended services is consistently evaluated as unsatisfactory in all reports.

neither Henriquez nor respondent had visited the minor children since January 2025, when Henriquez (but not respondent) had been observed at the foster home on an unapproved day for visitation. The permanency order found that Henriquez and respondent were "transient and not maintaining communication with the agency," that services were incomplete, and that respondent had not been visiting the minor children. The court found respondent was unfit, unable, and unwilling to parent the minor children.

¶ 12 Another permanency order, filed June 26, 2025, changed the goal from return home to substitute care, pending a determination on the termination of parental rights. In that order, the trial court found that respondent had made neither reasonable progress nor efforts toward the return home of the minor children, and he was unfit, unable, and unwilling to parent the minor children.

¶ 13 In the June 26, 2025, permanency order, the trial court also granted leave to file a petition to terminate parental rights, which the State initially filed on August 7, 2025, and amended on November 13, 2025.[2] The State's termination petition alleged that both respondent and Henriquez were unfit parents under several grounds. As to respondent specifically, the petition alleged that he was unfit because (1) he abandoned his minor children (750 ILCS 50/1(D)(a) (West 2024)); (2) he failed to maintain a degree of interest, concern or responsibility as to the welfare of the minor children (*id.* § 1(D)(b)); (3) he failed to protect the minor children from conditions within their environment injurious to their welfare (*id.* § 1(D)(g)); (4) he failed to make reasonable efforts to correct the conditions that were the basis for the minor children's removal between August 16, 2024, and August 7, 2025 (*id.* § 1(D)(m)(i)); (5) he failed to make reasonable progress toward the return of the minor children during the same time period (*id.* § 1(D)(m)(ii)); and (6) he

_____

[2]The amended petition corrected several scrivener's errors regarding fitness period end-dates, changing "2024" to "2025."

demonstrated an intent to forgo his parental rights as manifested by his failure for 12 months to visit the children, communication with the children or agency, or maintain contact with or plan for the future of the children (*id.* § 1(D)(n)).

¶ 14    On September 30, 2025, the court appointed an attorney for respondent and continued the termination hearing to a later date after he appeared via Zoom for the scheduled termination hearing.

¶ 15                                    A. Parental Fitness Hearing

¶ 16    On November 13, 2025, the trial court heard the fitness portion of the petition to terminate parental rights. At the outset, the State asked that the court take judicial notice of several documents, including the petition for adjudication of wardship, the adjudicatory order, and the permanency hearing orders from May 1, 2025, and June 26, 2025. The court took judicial notice of these documents over respondent's relevancy objection.

¶ 17    The State first called Chase Horton, a police officer with Crystal Lake, who testified as follows. He was dispatched on June 8, 2024, regarding a harassment call claiming that the caller's vehicle was being followed by numerous other vehicles. At the scene, Horton met the caller, Henriquez, at a gas station. She was in the driver's seat of a parked minivan. The van's interior had a "foul odor and just disarray of items." He observed food, mold, and fecal matter inside the van. Three children were in the van with Henriquez: I.D., D.D., and A.D. Respondent was not in the van but instead was in the gas station when Horton arrived on scene. Horton later learned that M.D. was with Henriquez's mother and stepfather that day.

¶ 18    Horton spoke with Henriquez, who told him that her vehicle was being followed, that the other vehicles had left before he arrived, and that one of the other vehicles had taken three of her

children. It was later discovered that the three children she claimed were kidnapped were the three children present in her van.

¶ 19    Horton also spoke with respondent, who echoed Henriquez's claims that their van had been followed and that their children had been kidnapped earlier that day. He claimed that they had made a stop in Hoffman Estates, where a gentleman in a van had lured three of his children with candy into a van. He told Horton that Henriquez's stepfather had found the three children and returned them to him and Henriquez.

¶ 20    Horton examined the three children, and, following his examinations, took them into protective custody. He observed that their clothes were dirty with food stains, fecal matter, and urine stains. They had bruises and were dirty. One of the car seats had mold and fecal matter throughout the car seat. Horton never obtained a home address from Henriquez or respondent.

¶ 21    Justin Koster was also a police officer with Crystal Lake who responded to the scene with Horton, arriving sometime after him. Koster's testimony was consistent with Horton's account of the scene, including the physical condition of the three children and Henriquez's claim that somebody tried to kidnap the children. Koster spoke with the children at the scene, and D.D., who was eight or nine years old, denied that they had been kidnapped.

¶ 22    Alberta Crescenzo was the DCFS caseworker assigned to the minor children's case since June 2024, and she testified as follows. Crescenzo identified several State exhibits that were admitted into evidence, including three DCFS family service plans (approval dates of July 24, 2024, November 25, 2024, and June 8, 2024) and the integrated assessment. She confirmed that the recommended services for respondent included individual counseling, a substance abuse assessment, compliance with visitation, parenting classes, and participation in drug screens.

¶ 23    During her time as the caseworker, she had difficulty determining where respondent was residing. At the time of the dispositional hearing in September 2024, she was having contact with respondent and Henriquez a "[c]ouple times a month," but she did not know where they were residing. Also at the time of the dispositional hearing, she was receiving reports that both parents were visiting with the minor children, with Henriquez visiting more than respondent. Respondent had not visited the children since January 2025.

¶ 24    Crescenzo testified that, from the time of the dispositional hearing in September 2024 until the permanency goal was changed in June 2025 to substitute care, neither respondent nor Henriquez had engaged in any of the recommended services. During the same timeframe, she had had no contact with respondent. Regarding respondent's services specifically, Crescenzo confirmed that respondent had not complied with drugs screens, had not completed substance abuse services, had not obtained a psychiatric assessment, had not engaged in counseling, had not completed parenting coaching, and had not demonstrated an ability to provide for the minor children's basic needs.

¶ 25    Respondent testified last. He testified that in June 2024, he was unemployed and living in Rock Island at a hotel. He would stay at the hotel for a couple of weeks to two months before moving somewhere else, which was typical of his living situation at the time. His source of income for the entire pendency of the case was disability income; he had looked for jobs but remained unemployed.

¶ 26    Respondent first met with Crescenzo in June 2024, and she did not offer him assistance with trying to find a permanent residence. He testified that he stayed in contact with Crescenzo "for a little while until [his] phone broke." His phone broke a "couple months" after they first met. He was unable to get a new phone until June 2025. After he got a new phone, he called the DCFS

office but "nobody never returned [his] phone call." When he did not have a phone, he talked with Crescenzo by asking someone else to use their phone, and he told her his phone was broken.

¶ 27 Respondent was aware of several of his required services, naming parenting classes, drug assessments, and counseling. He claimed to have completed a parenting class, but he admitted he had not provided Crescenzo with documentation supporting his completion. Crescenzo had referred him to ROAN solutions for his services, but when he contacted ROAN, they told him that he needed to be living in McHenry County for them to work with him.

¶ 28 On cross-examination, respondent said that, when he was originally referred to ROAN in June 2024, he received an e-mail back that "told me I had to wait," but the e-mail did not say for how long. He did not recall who contacted him from ROAN. He was unaware that ROAN had not turned down Henriquez for services, and he later confirmed that he had been living with Henriquez throughout 2024 and until some point in 2025. Regarding his phone, respondent clarified that it had broken only a few weeks before June 2025, and he got a new phone in June; he agreed that he was without a phone for only a few weeks in May 2025. Regarding the parenting class, he claimed to have completed it "[t]he other day" and, when asked if that meant within the last week, he replied: "No. Recently."

¶ 29 In closing argument, respondent's counsel characterized the case as "nothing more than a failure of the system to help two people that needed help."

¶ 30 On December 17, 2025, the trial court entered its written memorandum and decision on parental fitness. The court stated that it had reviewed and considered the pleadings, the orders entered in the juvenile cases, the evidence at the hearing, the orders taken judicial notice of at the hearing, the exhibits, and more. It found the testimony of the State's witnesses credible, describing the testimonies as "forthcoming and direct." Testimony from DCFS agents, including Crescenzo,

was consistent with the admitted exhibits. In contrast, the court found that respondent was not credible in his testimony. The court lengthily summarized the evidence of parental fitness.

¶ 31    The trial court found that the State proved that respondent was unfit by clear and convincing evidence on all six alleged grounds: (1) he had abandoned the minor children; (2) he had failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minor children; (3) he failed to protect the minor children from conditions in their environment injurious to their welfare; (4) he failed to make reasonable efforts to correct the conditions of the minor children's removal from August 16, 2024, through August 7, 2025; (5) he failed to make reasonable progress toward the return home of the minor children from August 16, 2024, through August 7, 2025; and (6) he demonstrated an attempt to forgo his parental rights by failing for 12 months to visit the minor children, communicate with them or the agency, and maintain contact with or plan for a future with the minor children. The court cited respondent's "complete lack of effort to even visit" the minor children and noted that his testimony was "completely devoid of any mention" of the children. The court continued that respondent's lack of engagement in services for the entirety of the case supported its finding that he failed to maintain a reasonable degree of interest, failed to make reasonable efforts, failed to make reasonable progress, and demonstrated an intent to forgo his parental rights by not planning for the minor children's future. The court concluded that respondent was not close to reunification with the minor children. The matter was continued for a best interest hearing.

¶ 32                                B. Best Interest Hearing

¶ 33    The trial court heard the best interest portion of the termination petition on January 22, 2026. At the outset, the court noted that Henriquez had indicated that she would sign surrenders

and specific consents, so she and her attorney were "off accomplishing that" and the hearing was proceeding as to respondent.

¶ 34    Crescenzo testified that she had referred the matter to legal screening for potential adoption, and the matter had passed screening. The minor children were currently placed together in the same foster home with their maternal grandparents, and they had been placed with them for at least a year and a half. Crescenzo had observed the minor children in their placement and spoken with the foster parents, and it was her opinion that the children loved their grandparents. She believed that the grandparents were providing for all four minor children's security, emotional education, and basic needs. The minor children had special needs that were being met in their placement. She continued that "there's love. There's obvious attachment with the grandparents." She opined that it was in the minor children's best interests that respondent's parental rights be terminated and that they be adopted by their grandparents.

¶ 35    Charleen Miller was the minor children's CASA advocate, and she testified that she had visited the children at their foster placement approximately every two weeks, observing them at both their home and their schools. Her observations supported a loving bond between the minor children and their foster parents. Early in their placement, the minor children had said they missed their mom and dad, but she had not heard them say that in "a good nine or more months." She believed that they were in a positive placement, and she had observed growth in the children since their placement; "their faces are fuller, they have color, they have energy, and they laugh." The children were also making progress intellectually. In her opinion, placing the minor children with the maternal grandparents was in the children's best interests.

¶ 36    Diana Kordik, the minor children's maternal grandmother, testified that the minor children had been with her for almost two years. The minor children lived with her, her husband, and her

- 11 -

son, who was 26 years old. Everybody got along at home. She loved the children and was committed to raising them. She would adopt the children if given the opportunity. Likewise, Patrick Kordik, the minor children's grandfather, testified that he was committed to raising the minor children and meeting their needs, and he would adopt the children if given the opportunity.

¶ 37 Respondent presented no evidence at the hearing. The matter was continued for a decision and permanency hearing.

¶ 38                                C. Termination of Parental Rights

¶ 39 On February 2, 2026, the trial court issued its written memorandum and decision terminating respondent's parental rights, which amended the court's memorandum and decision on parental fitness by adding findings and analysis from the best interest hearing. Regarding the minor children's best interests, the court found that they were in a "safe, nurturing environment" with their maternal grandparents, where they were "thriving" and "they are loved." The court noted that respondent had failed to visit the children or develop a relationship with them, and he had not participated in services toward reunification. On the one hand, respondent had not demonstrated an ability to parent the minor children, and on the other hand, the maternal grandparents had been meeting the children's needs for nearly two years and were committed to adopting and raising them. The court found that the State had "overwhelmingly" proved by a preponderance of the evidence that termination of respondent's parental rights was in the minor children's best interests. Accordingly, it granted the State's petition to terminate respondent's parental rights.

¶ 40 Following the termination of respondent's parental rights, the trial court entered a permanency order on February 6, 2026, that changed the permanency goal to adoption, over respondent's objection.

¶ 41    Respondent timely appealed and thereafter moved for the appointment of counsel on appeal, which was granted.

¶ 42                                    II. ANALYSIS

¶ 43    Respondent appeals following the trial court's termination of his parental rights. His notice of appeal contends that the court erred in both its December 17, 2025, order finding him unfit and its February 2, 2026, order finding that termination of his parental rights was in the minor children's best interests. The notice also identifies the August 16, 2024, order finding the minor children neglected, and two permanency orders from May 1, 2025, and June 26, 2025.

¶ 44    Respondent's appellate counsel has moved to withdraw under the *Anders* framework. See *Anders*, 386 U.S. at 744-45. The *Anders* withdrawal procedure applies to appeals from the termination of parental rights. *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000). In recognition of the deep importance of parental rights, appellate counsel seeking to withdraw from an appeal from a termination of parental rights should review both the finding of unfitness as well as the best interest determination. *Id.* Counsel has done so here.

¶ 45    Counsel's motion is supported by a sufficient record of the relevant proceedings and by a brief providing a statement of facts, identifying potential errors in the trial court, sketching conceivable arguments for appeal, and explaining why the issues are ultimately frivolous. See *In re Zy. D.*, 2021 IL App (2d) 200629, ¶ 10 (an *Anders* brief must set out any irregularities in the trial process or other potential error that might be meritorious, and this court must be provided with transcripts of the fitness and best interest hearings); see also *In re Austin C.*, 353 Ill. App. 3d 942, 945-46 (2004) (clarifying the requirements for withdrawal of appellate counsel). Counsel also notified respondent of her motion to withdraw and his right to file a *pro se* response.

¶ 46    The involuntary termination of parental rights under the Juvenile Court Act of 1987 is a two-stage process. 705 ILCS 405/2-29(2) (West 2020); *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004). The first stage requires that the State prove by clear and convincing evidence that the parent is an "unfit person" under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)) lists various grounds to find a parent unfit, any of which alone will support a finding of unfitness. *In re Tiffany M.*, 353 Ill. App. 3d at 889. Therefore, we may affirm the trial court's finding where the evidence supports any one of the alleged grounds of unfitness. See *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 20 ("The court need find a parent unfit under only one of the grounds" in section 1(D) of the Adoption Act to proceed to a best-interest hearing.).

¶ 47    If the court finds the parent unfit, the court moves to the best-interest stage of the proceeding. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). In the best-interest stage, the focus of the proceeding shifts to the child: whether, in light of the child's needs, the parental rights should be terminated. *In re Tr. A.*, 2020 IL App. (2d) 200225, ¶ 56. The State's burden of proof at the best-interest stage is a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 366 (2004).

¶ 48    To reverse a trial court's finding that there was clear and convincing evidence of parental unfitness, a reviewing court must determine that the trial court's finding was against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or the decision is unreasonable, arbitrary, or not based on the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 30. Likewise, we review a trial court's best-interest finding under the manifest-weight-of-the-evidence standard. *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 74.

¶ 49                                    A. Parental Fitness Finding

¶ 50    Appellate counsel contends that no issue of arguable merit exists as to the trial court's finding of respondent's unfitness. Counsel sketches a potential argument that the court failed to properly consider respondent's circumstances of poverty and homelessness—or, as respondent's trial counsel put it, the system's failure to help respondent and Henriquez. The potential argument continues that it was the agency, not respondent, who failed to make reasonable efforts in this case, and the lack of progress was attributable to systemic failures rather than parental unwillingness. However, counsel contends that this argument fails for several reasons: (1) reasonable progress is analyzed under an objective standard, and any single ground of unfitness will support the trial court's fitness finding; (2) the agency demonstrated efforts to contact respondent, whereas he failed to attend the shelter care hearing, dispositional hearing, and several permanency hearings; and (3) respondent had neither visited nor contacted the minor children since January 2025, showing he had made no efforts toward maintaining interest or correcting the conditions that led to the minor children's removal from his care.

¶ 51    A parent may be found unfit for failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare. 750 ILCS 50/1(D)(b) (West 2024). In assessing this ground of unfitness, a court considers the parent's efforts to visit and maintain contact with the child, among other things such as inquiries into the child's welfare. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. A parent's circumstances are relevant to the court's analysis. *In re M.I.*, 2016 IL 120232, ¶ 27. Although circumstances that warrant consideration include a parent's poverty and difficulty obtaining transportation and poverty, such circumstances will not excuse a complete lack of communication with the minor children. *In re Adoption of Syck*, 138 Ill. 2d 255, 278-80 (1990).

¶ 52    Whether a parent made reasonable efforts (750 ILCS 50/1(D)(m)(i) (West 2024)) is likewise a subjective standard related to the goal of correcting the conditions that caused the child's removal from the parent's custody. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). That is, the reasonable efforts inquiry focuses on the effort of a particular parent that would be reasonable for that parent under the circumstances of the case, and it narrowly considers only the correction of those conditions originally providing a basis for the child's removal. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 42.

¶ 53    In contrast, reasonable progress (750 ILCS 50/1(D)(m)(ii) (West 2022)) is an objective standard, reviewing the steps the parent has taken toward the goal of reunification. *In re Dar. H.*, 2023 IL App (4th) 230509, ¶ 53. Reasonable progress exists when the trial court can conclude that it will be able to return the child to parental custody in the near future. *Id.* The benchmark of reasonable progress is compliance with the service plans and court directives in light of both the conditions that gave rise to the child's removal and other conditions that later became known and would prevent the court from returning the child to the parent's custody. *In re Z.M.* 2019 IL App (3d) 180424, ¶ 68 (citing *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001)). In assessing reasonable progress, the trial court considers evidence occurring only during the relevant nine-month period. *Id.*

¶ 54    Here, the record is clear that respondent failed to make reasonable progress toward the goal of reunification. Crescenzo testified that respondent had failed to engage in any recommended services; the only contrary evidence respondent provided was a claim that he recently completed a parenting class, but he admitted that he had failed to provide the agency with documentation of the class. The record shows that respondent had not completed a psychiatric or substance abuse assessment, had not engaged with individual counseling or drug screens, had not complied with

visitation, had not demonstrated an ability to provide for the minor children's basic needs, and had not maintained contact with his caseworker. While respondent undoubtedly faces individual and systemic hurdles toward the goal of reunification, the objective fact is that he was no closer to reunification at the fitness hearing than he was at the start of this case.

¶ 55    A single ground of unfitness is enough to affirm the trial court's finding, and the court's finding of a lack of reasonable progress was reasonable. Nevertheless, we further find that there is no non-frivolous argument that respondent failed to maintain reasonable interest and make reasonable efforts. The evidence before the trial court was that respondent had not visited the minor children since January 2025 and had failed to maintain contact with his caseworker for even longer. There is no evidence that he was otherwise maintaining contact with the minor children. Respondent's complete lack of contact with the children and agency from January through August 7, 2025, defeats any argument that his circumstances excused his lack of efforts. See *In re A.S.B.*, 293 Ill. App. 3d 836, 843-44 (1997) ("Even extreme circumstances that impede the parent's ability to develop a relationship with the child do not excuse a complete lack of communication or interest in the child."). As we have found that at least three of the fitness findings are not susceptible to any reasonable argument on appeal, we agree with counsel that no non-frivolous argument exists as to the trial court's parental fitness finding.

¶ 56                    B. The Minor Children's Best Interests

¶ 57    Appellate counsel turns to the next potential argument on appeal, namely, the best interests of the minor children. Counsel recites the relevant evidence proffered regarding their best interests and notes our deference to the trial court's findings. Counsel's review concludes that the evidence does not support any reasonable or non-frivolous argument to reverse the trial court's best-interests determination, and we agree.

¶ 58    "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interests in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. In determining the minor children's best interests, the trial court shall consider the following factors: (1) their physical safety and welfare; (2) the development of their identity; (3) their background and ties; (4) their sense of attachments, including where they feel loved, valued, and secure; (5) their wishes and long-term goals; (6) their need for permanence; (7) the uniqueness of every family and the children; (8) the risks attendant to substitute care; and (9) the preferences of the persons available to care for the children. 705 ILCS 405/1-3(4.05) (West 2024). The trial court may also consider the nature and length of the minor children's relationship with their current caretakers and the effect a change would have on their emotional and psychological well-being. *In re Nevaeh R.*, 2017 IL App (2d) 170229, ¶ 27. The trial court need not explicitly reference each factor. *Id.*

¶ 59    Here, respondent provided no evidence at the best-interest hearing. The State's undisputed evidence at the hearing demonstrated that the minor children were placed together and doing well with their maternal grandparents, who loved the children, provided for their needs, were committed to raising them, and were willing to adopt the children. The minor children's grandparents had been caring for them for almost two years, and, as discussed in review of the fitness portion of the proceeding, respondent had made no reasonable progress or efforts toward reunification during the pendency of this case. Miller testified that the minor children's placement with their grandparents was in their best interests, and Crescenzo opined that termination of respondent's parental rights was in their best interests. Under these facts, we agree with counsel that any argument on the issue of best interests would be unreasonable and frivolous.

¶ 60                                          C. Other Orders

¶ 61    In addition to the order terminating respondent's parental rights, respondent's notice of appeal identified several other orders preceding the termination order, which were not directly addressed by appellate counsel's *Anders* brief. First, the notice of appeal names the August 16, 2024, adjudicatory order finding the minor children neglected based on an environment injurious to their welfare. Although it is unclear from the notice whether respondent intended to challenge this order on appeal, we note that the trial court's neglect finding was based on the stipulations by both respondent and Henriquez to various allegations of the State's petition for adjudication of wardship, and we therefore would see no issue of arguable merit regarding the neglect finding. That said, we believe it is unlikely that respondent's notice was indicating an intent to challenge this order, as an appeal of the neglect finding would have had to have been timely filed following the final and appealable dispositional order entered on September 20, 2024. See *In re Leona W.*, 228 Ill. 2d 439, 456 (2008) ("Appealing a dispositional order is the proper vehicle for challenging a finding of abuse or neglect."); *In re Barion S.*, 2012 IL App (1st) 113026, ¶¶ 34-39 (finding the appeal was timely when the notice of appeal was filed within 30 days of the entry of the dispositional order).

¶ 62    Respondent's notice of appeal also names two permanency orders, one from May 1, 2025, and another from June 26, 2025, each finding that respondent was unfit, unable, and unwilling to parent the minor children and that he had not made reasonable progress nor reasonable efforts toward the minor children's return home during the relevant reporting period. Per the record, respondent was not present at the permanency hearings challenged on appeal. Moreover, we have already reviewed the totality of the evidence related to respondent's fitness in the context of the termination order and found no issue of arguable merit, which included evidence available at the permanency hearings. The evidence supports that, at the time of the permanency orders, respondent

had not engaged in any recommended services, had not been communicating with DCFS, and had not been maintaining visitation with the minor children. Accordingly, we see no issue of arguable merit related to these additional permanency orders.

¶ 63                                    III. CONCLUSION

¶ 64    Following our examination of the record, appellate counsel's motion to withdraw, and the accompanying brief, we agree with counsel that respondent's appeal does not present any issue of arguable merit. Therefore, we grant counsel's motion to withdraw and affirm the judgment of the circuit court of McHenry County.

¶ 65    Affirmed.